UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Joseph Wagner,

        Plaintiff,

v.

Lisa Scheirer, Randall Hukriede, Scott
Schroeder, and Rachel Studanski,

        Defendants.

File No. 23-cv-1162 (ECT/LIB)

**OPINION AND ORDER**

---

Matthew C. Berger, Gislason & Hunter LLP, New Ulm, MN, for Plaintiff Joseph Wagner.

Christina M. Brown, Office of the Minnesota Attorney General, St. Paul, MN, for Defendants Lisa Scheirer, Randall Hukriede, Scott Schroeder, and Rachel Studanski.

---

Plaintiff Joseph Wagner is a Minnesota livestock farmer with operations in Otter Tail and Douglas Counties. He owns a cow/calf operation and a separate feedlot. In this case, Mr. Wagner claims that Defendants—four employees of the Minnesota Pollution Control Agency ("MPCA")—violated his due-process and free-speech rights under the United States and Minnesota Constitutions and tortiously interfered with his prospective economic advantage. Among other abusive activities, Mr. Wagner claims that Defendants withheld issuance of a permit that would have enabled Mr. Wagner to expand his feedlot operation and sought to impose on Mr. Wagner (or perhaps his business organization) the largest animal feedlot fine in state history. Mr. Wagner seeks damages from Defendants in their individual capacities.

Defendants seek dismissal of Mr. Wagner's operative Amended Complaint under Federal Rule of Civil Procedure 12(b)(6), and the motion will be granted. The short story is that Mr. Wagner's federal constitutional claims are not plausibly alleged, and they will be dismissed with prejudice. Mr. Wagner's state-law claims will be dismissed without prejudice, leaving Mr. Wagner free to pursue those claims in Minnesota state court.

I[1]

*Mr. Wagner owns a cow/calf operation and a separate feedlot.* Am. Compl. [ECF No. 20] ¶¶ 19–21. A "cow/calf operation" is a beef farming operation in which a herd of cows is maintained and bred on a regular basis, and calves are sold or transferred to another location for finishing. *Id.* ¶¶ 16–17. The animals in a cow/calf operation generally are raised on pastures. *Id.* ¶ 18. During the relevant period, Mr. Wagner operated his cow/calf operation on several pastures he owned or leased in Douglas and Otter Tail Counties. *Id.* ¶ 19. Mr. Wagner's feedlot is located in Douglas County; during the relevant period, it consisted of "a series of open lots, a runoff settling area, a vegetated infiltration area for filtering and treating runoff, two feed storage areas, and two commodity buildings." *Id.* ¶ 20. Mr. Wagner's feedlot had a maximum capacity of 679 animal units. *Id.*[2]

---

[1]    In accordance with the standards governing a Rule 12(b)(6) motion, the facts are drawn from Mr. Wagner's Amended Complaint, materials embraced by it, and applicable legal authorities. *Gorog v. Best Buy Co., Inc.*, 760 F.3d 787, 792 (8th Cir. 2014) (citation omitted).

[2]    An "animal unit" is a unit of measurement "used to compare differences in the production of animal manure." Minn. R. 7020.0300, subp. 5. For example, one mature dairy cow under 1,000 pounds is equal to 1.0 animal unit, but a mature dairy cow over 1,000 pounds equals 1.4 animal units, and a calf equals 0.2 units. Minn. R. 7020.0300, subp. 5(A).

*Minnesota law distinguishes between cow/calf operations and feedlots.* Rules promulgated by the MPCA supply the controlling definitions. Under these rules:

> "Animal feedlot" means a lot or building or combination of lots and buildings intended for the confined feeding, breeding, raising, or holding of animals and specifically designed as a confinement area in which manure may accumulate, or where the concentration of animals is such that a vegetative cover cannot be maintained within the enclosure. . . . *Pastures shall not be considered animal feedlots under these parts.*

Minn. R. 7020.0300, subp. 3 (emphasis added). "Pastures," by contrast, are:

> areas, including winter feeding areas as part of a grazing area, where grass or other growing plants are used for grazing and where the concentration of animals allows a vegetative cover to be maintained during the growing season, . . . or . . . agricultural land: (1) where livestock are allowed to forage during the winter; (2) that is used for cropping purposes in the growing season; and (3) where the concentration of animals is such that a vegetative cover, whether of grass, growing plants, or crops, is maintained during the growing season, except in the immediate vicinity of temporary supplemental feeding or watering devices.

Minn. R. 7020.0300, subp. 18. Thus, for example, one difference between a "feedlot" and a "pasture" appears to be whether the concentration of animals prevents maintenance of a vegetative cover (in the case of an "animal feedlot") or allows it (in the case of a "pasture").

*Defendants are MPCA employees who regulate feedlots.* Am. Compl. ¶¶ 3–12. The MPCA possesses authority generally to promote waste disposal and improve air quality. Minn. Stat. §§ 116.02, 116.07. Under this general authority, the MPCA is "authorized to 'adopt rules governing the issuance and denial of permits for livestock feedlots, poultry lots or other animal lots.'" Am. Compl. ¶ 22 (quoting Minn. Stat. § 116.07, subdiv. 7(h)). The MPCA also has enforcement power, and may pursue remedies such as civil penalties,

injunctions, and criminal prosecutions. Minn. Stat. § 115.071. Defendant Randall Hukriede worked as program manager of the MPCA's feedlot program and supervised Defendant Lisa Scheirer. Am. Compl. ¶ 6. Ms. Scheirer, in turn, was supervisor of the West Feedlot Unit. *Id.* ¶ 3. Defendant Scott Schroeder was an Environmental Specialist working under Ms. Scheirer's direction. *Id.* ¶ 9. Defendant Rachel Studanski was a compliance coordinator with the MPCA's feedlot program. *Id.* ¶ 12.

*Mr. Wagner received and settled MPCA "Alleged Violation Letters" in 2014 and 2015.*[3] The 2014 letter concerned Mr. Wagner's alleged failure to obtain a permit for his cow/calf operation in Douglas County. *Id.* ¶ 24. Mr. Wagner disputed this alleged violation; he maintained that the unpermitted lands were not feedlots, but pastures not subject to the MPCA's feedlot permitting requirements. *Id.* ¶ 25. Mr. Wagner nonetheless paid a $12,000 penalty to resolve the alleged violation because it made better economic sense; the cost of pursuing a legal defense and remedies would have exceeded the cost of the penalty. *Id.* ¶ 26. The 2015 Alleged Violation Letter concerned Mr. Wagner's failure to obtain a permit for his cow/calf operation in Otter Tail County. *Id.* ¶ 28. Defendants "participated in the decision to impose a $20,000 penalty against Mr. Wagner" arising from this alleged violation. *Id.* ¶ 29. Mr. Wagner maintained that the land in Otter Tail County contained pastures, not feedlots, and denied that he was required to obtain a permit. *Id.* ¶ 30. "In October 2016, Mr. Wagner and the MPCA entered into a Settlement Agreement in which the MPCA agreed to abate $12,444.50 of the $20,000 penalty it had previously

---

[3]     It is unclear whether disputes between Mr. Wagner and the MPCA predate the 2014 Alleged Violation Letter. This is the first dispute referenced in the Amended Complaint.

imposed[,] and Mr. Wagner agreed to pay the remaining $7,555.50 of such penalty." *Id.* ¶ 32.

*Mr. Wagner applied for an NPDES feedlot permit in 2015 and received the permit in 2016.*  In December 2015, Mr. Wagner applied for a National Pollutant Discharge Elimination System (or "NPDES") permit to modify and expand his existing feedlot in Douglas County. *Id.* ¶ 33.[4]  By constructing new lots, barns, storage areas, and more, Mr. Wagner's proposed expansion would increase his feedlot's capacity roughly tenfold, from 679 animal units to 6,800 animal units. *Id.* ¶¶ 20, 33.  Mr. Schroeder sent a draft permit to Mr. Wagner on July 8, 2016. *Id.* ¶ 35.  The draft "ignored the separate nature of Mr. Wagner's cow/calf operation and his animal feedlot" and, if approved, would have "improperly expanded the scope of the MPCA's regulatory powers beyond the agency's legal authority by regulating Mr. Wagner's pastures." *Id.* ¶ 36.  Mr. Wagner objected to the draft permit up front, but it was too late; the MPCA published a notice of intent to issue the NPDES permit as drafted and held a public comment period from July 18 to August 17, 2016. *Id.* ¶¶ 38–39.  During the public comment period, Mr. Wagner wrote to Mr. Schroeder, emphasizing the separateness of the cow/calf (pastures) and feedlot operations and describing his objections to the draft permit along with proposed amendments. *Id.* ¶ 40.  Mr. Schroeder responded that the MPCA would incorporate Mr. Wagner's comments

---

[4]    "NPDES permits regulate the type and quantity of pollutants that can be released into state and federal waters, as well as include conditions to ensure compliance with state water quality standards."  Defs.' Mem. in Supp. [ECF No. 22] at 3 n.5 (citing 33 U.S.C. § 1342(a)(1) and 40 C.F.R. § 122.44(d)).  Issuance of an NPDES permit involves a public notice and comment period.  Minn. Stat. § 116.07, subdiv. 7c.

as amendments to the final permit. *Id.* ¶ 41. The MPCA issued the final permit on October 6, 2016. *Id.* ¶ 42. The permit "expressly acknowledged that Mr. Wagner's cow/calf operation is 'separate' from his feedlot and is 'managed through a "Cow/Calf Management Plan" submitted by [Mr. Wagner] to the MPCA on January 2, 2016, and approved by the MPCA on February 5, 2016.'" *Id.* (alteration in original).[5]

*Mr. Wagner requested an NPDES permit modification.* After receiving the NPDES permit, Mr. Wagner decided to make changes to some of the permitted buildings and land. *Id.* ¶ 43. In Mr. Wagner's view, these changes were minor, but the MPCA disagreed; it considered the changes to be a "major modification" and published another notice of intent and public comment period, which ran from April 3 to May 3, 2017. *Id.* ¶¶ 43–44. No public comments were received. *Id.* ¶ 44. Mr. Wagner alleges that the MPCA's normal practice when no comments are received is to issue a permit within 40 days of the comment period ending. *Id.* ¶ 56.

*On May 3, 2017—the last day of the public comment period—the MPCA conducted an inspection of Mr. Wagner's cow/calf operation. Id.* ¶ 45. Mr. Wagner alleges the inspection was "a pretext to manufacture alleged violations and use the pending application to coerce [him] into paying a penalty, refraining from exercising his legal right to challenge the alleged violations and penalty, and accepting the MPCA's authority to regulate his

---

[5]     The February 2016 "Cow/Calf Management Plan" does not seem essential to Mr. Wagner's claims in this case or material to Defendants' Rule 12(b)(6) motion. The plan's purpose was to ensure that Mr. Wagner managed his cow/calf operation consistent with the "pasture" definition of Minn. R. 7020.0300, subp. 18. In other words, it seems the plan was intended to ensure that Mr. Wagner's cow/calf operation did not become a feedlot, either intentionally or unintentionally.

pastures and cow/calf operation." *Id.* ¶ 46.  He claims Ms. Scheirer scheduled the inspection and that Mr. Hukriede, Mr. Schroeder, and Ms. Studanski participated in the decision to schedule the inspection, manufacture violations, and coerce Mr. Wagner into paying penalties.  *Id.*

*The MPCA issued an Alleged Violation Letter arising from the May 3 inspection on May 23, 2017.  Id.* ¶ 47.  This letter alleged that one of Mr. Wagner's buildings was a feedlot requiring a permit and that a discharge of manure and manure-contaminated runoff had occurred at one of Mr. Wagner's Otter Tail County pastures.  *Id.*  Mr. Wagner denied the violations.  *Id.* ¶ 48.  The MPCA conducted another inspection in October 2017, then issued an administrative order restating the alleged violations and adding violations.  *Id.* ¶¶ 49–50.  Mr. Wagner continued to dispute the allegations, and in March 2019, Mr. Hukriede issued three administrative penalty orders totaling $28,020.00 against Mr. Wagner.  *Id.* ¶¶ 52–53.  Mr. Wagner commenced administrative proceedings and, after extensive discovery, settled with the MPCA in January 2020.  *Id.* ¶¶ 54–55.

*The MPCA delayed issuing the modified NPDES permit, prompting Mr. Wagner to bring suit in Ramsey County District Court.*  The MPCA withheld Mr. Wagner's modified NPDES permit pending resolution of the alleged violations resulting from the May 3, 2017 inspection.  *Id.* ¶¶ 58–61.  On October 4, 2018, Mr. Wagner filed suit against the MPCA in Ramsey County District Court for a writ of mandamus to approve the modified NPDES permit.  *Id.* ¶ 64.  The MPCA issued the permit on November 20, 2018.  *Id.* ¶ 65.

*Mr. Wagner alleges he lost business opportunities resulting from the MPCA's delay in issuing the modified NPDES permit.*  Mr. Wagner had been awarded a "Conservation

Program Contract" for $450,000 in financial assistance for feedlot components through a program with the National Resources Conservation Service, which was eventually revoked for failure to complete construction. *Id.* ¶¶ 67, 74. Mr. Wagner also planned to obtain a construction loan from his lender and says the loan would have been approved had he received the modified permit. *Id.* ¶¶ 68–69. "Mr. Wagner (individually or through representatives or agents acting on his behalf) repeatedly informed the MPCA that the wrongful refusal to issue the modified NPDES permit . . . was preventing Mr. Wagner from moving forward with the planned construction." *Id.* ¶ 72. Mr. Wagner claims that the MPCA's failure to issue the modified permit prevented him from completing construction and caused him to "suffer[] extensive damages, including . . . increased construction costs, increased interest rates, and lost profits." *Id.* ¶¶ 74–75.

*Mr. Wagner's legislative petitioning led to a 2019 statutory change.* Mr. Wagner's dispute with the MPCA over the definition of "pastures" prompted Mr. Wagner to petition the Minnesota legislature to clarify the law in this area. *Id.* ¶ 76. During a 2019 special session, and in response to Mr. Wagner's petitioning, the legislature

> modified the statutory definition of "pastures" to expressly recognize that "a cover of vegetation or crop residues is not required . . . in sacrificial areas" for agricultural land to qualify as a pasture and to clarify that a feedlot permit may not "impose any requirements related to any pastures owned or utilized by the feedlot operator other than restrictions under a manure management plan." *See* 2019 Minn. Sess. Law, 1st Sp. Sess. ch. 1, art. 2, §§ 16-17.

*Id.* ¶ 77.

*In March 2021, the MPCA sued Mr. Wagner in Douglas County District Court.* The MPCA alleged that Mr. Wagner had allowed unauthorized discharges from his feedlot, overstocked the feedlot, and maintained unauthorized manure stockpiles on the feedlot. *Id.* ¶ 78. The MPCA sought to impose a civil penalty in excess of $150,000. *Id.* According to Mr. Wagner, the penalty would be the largest the MPCA ever has imposed on a feedlot. *Id.* ¶ 80. Mr. Wagner alleges that each defendant participated in the decision to commence the action, and that the decision to sue was based on Mr. Wagner's appeals of prior administrative penalties and his legislative advocacy with respect to the definition of "pasture." *Id.* ¶¶ 81–82.

*Mr. Wagner filed this suit in April 2023.* ECF No. 1. Mr. Wagner asserts claims arising under federal and Minnesota law. (1) Through 42 U.S.C. § 1983, Mr. Wagner claims Defendants violated substantive and procedural due process rights guaranteed him under the Fourteenth Amendment to the United States Constitution. Am. Compl. ¶¶ 83–94. Mr. Wagner also bases this claim on Article I, Section 7 of the Minnesota Constitution. *Id.* ¶ 84. (2) Again through § 1983, Mr. Wagner claims that Defendants undertook their enforcement activities in retaliation for Mr. Wagner's exercise of his First Amendment rights to challenge the MPCA's enforcement activities and to petition the Minnesota legislature. *Id.* ¶¶ 95–107. Mr. Wagner also bases this claim on Article I, Section 7 of the Minnesota Constitution. *Id.* ¶ 103. (3) Mr. Wagner asserts a claim for tortious interference with prospective economic advantage under Minnesota common law, alleging that Defendants' delay in issuing the modified NPDES permit "intentionally interfered with Mr. Wagner's ability to timely construct the modified and expanded feedlot and thus

intentionally interfered with the economic advantage that Mr. Wagner reasonably expected to realize from the operation of the modified and expanded feedlot." *Id.* ¶¶ 108–114. For relief, Mr. Wagner seeks damages, "costs and disbursements . . ., including without limitation any allowable attorneys' fees and expert fees[,]" and "such other and further relief as the Court may deem just and equitable." *Id.* at 41 (following "WHEREFORE" clause).

II[6]

In reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Gorog v. Best Buy Co., Inc.*, 760 F.3d 787, 792 (8th Cir. 2014) (citation omitted). Although the factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). The complaint must "state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

---

[6] Defendants originally brought their motion to dismiss under Rules 12(b)(1) and 12(b)(6). ECF No. 21. Defendants, however, do not mention Rule 12(b)(1) or identify any argument challenging subject-matter jurisdiction in their briefs. And no subject-matter jurisdiction problem is apparent. It is true that the Eleventh Amendment bars claims for damages against state employees sued in their official capacities. *Kentucky v. Graham*, 473 U.S. 159, 169 (1985); *Andrus ex rel. Andrus v. Arkansas*, 197 F.3d 953, 955 (8th Cir. 1999). But the Amended Complaint seeks relief against the individual defendants only in their individual or personal capacities. *See* Am. Compl. ¶¶ 4, 7, 10, 13. (stating that Mr. Wagner asserts claims against each defendant in his or her "individual capacity"). Defendants' motion will therefore be adjudicated only under Rule 12(b)(6).

reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Ordinarily, courts do not consider matters outside the pleadings in resolving a Rule 12(b)(6) motion, *see* Fed. R. Civ. P. 12(d), but documents that are necessarily embraced by the pleadings may be considered without transforming the motion into one for summary judgment. *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n.4 (8th Cir. 2003) (citation omitted). Materials embraced by the complaint include "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 831 (8th Cir. 2003) (quoting *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 926 (9th Cir. 1996)). Filings in other cases referenced in the complaint may be considered both embraced by the complaint and matters of public record. *Fredin v. Miller*, No. 19-cv-3051, 2020 WL 3077708, at *5 (D. Minn. June 10, 2020) ("Given that [the] Complaint refers directly to other cases, the Court finds that the filings in those cases are matters embraced by the pleadings, as well as matters of public record."), *aff'd*, 840 F. App'x 61 (8th Cir. 2021); *see also Leonardo v. MSW Cap., LLC*, No. 16-cv-3845, 2017 WL 2062852, at *2 (D. Minn. May 12, 2017) (stating defendants' exhibits were "a quintessential example of materials that are 'necessarily embraced by the pleadings'" in part because the complaint "repeatedly references the state-court action.").

Here, Defendants filed a declaration and fourteen exhibits with their motion. *See* Brown Decl. [ECF No. 23]. Mr. Wagner argues that Exhibits 2, 8, 11, and 14 should be excluded from consideration because they are not embraced by the Amended Complaint.

Exhibit 2 is an email exchange between Mr. Wagner and Schroeder, the contents of which are referenced in the Amended Complaint. Am. Compl. ¶ 38. Exhibit 2 is thus embraced by the Amended Complaint and will not be excluded from consideration. Exhibits 11 and 14 are filings from the Ramsey County and Douglas County court proceedings, which the Amended Complaint discusses in some detail. *Id.* ¶¶ 64–66, 78–82. The filings are necessarily embraced by the Amended Complaint because the Amended Complaint refers to the cases directly, and the documents are matters of public record. *See Fredin*, 2020 WL 3077708, at *5. Exhibit 8—a draft stipulation—is neither a public record nor embraced by the Amended Complaint and will therefore be excluded from consideration.

III

A

Mr. Wagner claims "a constitutionally enforceable liberty interest and a fundamental right," which he says is deeply rooted in this nation's history and tradition, "to operate his animal feedlot and to engage in farming activities on his property where Mr. Wagner satisfied all of the requirements necessary for the issuance of an NPDES permit." Am. Compl. ¶ 85. Defendants argue that there is no fundamental right to farm or to operate a business free from regulations one dislikes, and, accordingly, that no substantive-due-process violation occurred. Defs.' Mem. in Supp. at 19. Mr. Wagner responds that the right he asserts is not a right to farm or operate free from regulations, but a right to "freely use and enjoy his property." Pl.'s Mem. in Opp'n [ECF No. 28] at 21.

To state a substantive-due-process claim against a state official, a plaintiff must demonstrate that a fundamental right was violated. A fundamental right is one that is

12

"objectively, 'deeply rooted in this Nation's history and tradition.'" *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997) (quoting *Moore v. City of E. Cleveland*, 431 U.S. 494, 503 (1977)). The plaintiff must also demonstrate that the official's conduct shocks the conscience. *Folkerts v. City of Waverly*, 707 F.3d 975, 980 (8th Cir. 2013). Whether conduct shocks the conscience is a question of law. *Id.* (citing *Terrell v. Larson*, 396 F.3d 975, 981 (8th Cir. 2005) (en banc)). Conscience-shocking conduct only includes "the most severe violations of individual rights that result from the brutal and inhumane abuse of official power." *White v. Smith*, 696 F.3d 740, 757–58 (8th Cir. 2012) (quotation marks omitted). "Only a purpose to cause harm *unrelated to the legitimate object of* the government action in question will satisfy the element of arbitrary conduct shocking to the conscience, necessary for a due process violation." *Folkerts*, 707 F.3d at 981 (cleaned up).

Mr. Wagner has not alleged facts plausibly showing the violation of any fundamental right. The Eighth Circuit has explicitly declined to recognize farming as a fundamental right. *United States v. White Plume*, 447 F.3d 1067, 1075 (8th Cir. 2006) ("The Supreme Court has not declared 'farming' to be a fundamental right, and we decline to do so today."). Neither has the right to "freely use and enjoy one's property" been recognized as a fundamental right by the Eighth Circuit, which Mr. Wagner acknowledges. Pl.'s Mem. in Opp'n at 21. Regardless, Mr. Wagner argues the proposed right is deeply rooted in the Nation's history and "is consistent with the Supreme Court's interpretation of the Constitution." *Id.* In support, he offers two zoning cases: *Washington ex rel. Seattle Title Tr. Co. v. Roberge*, 278 U.S. 116 (1928), and *Levin v. Upper Makefield Twp., Bucks Cnty., Pa.*, 90 Fed. App'x 653 (3rd Cir. 2004). In *Roberge*, the Supreme Court found that

a city ordinance impermissibly delegated permitting authority to a landowner's neighbors. *Roberge*, 278 U.S. at 117, 122. Key to the Court's decision, the neighbors were "not bound by any official duty, but [we]re free to withhold consent for selfish reasons or arbitrarily and may subject the [owner] to their will or caprice." *Id.* at 122. The MPCA is different. It is a state agency, created by statute, with defined governing principles. As Mr. Wagner points out, *Levin* does recognize the Third Circuit's holding that "*ownership* is a property interest worthy of substantive due process protection." *Levin*, 90 Fed. App'x at 659 (citations omitted) (emphasis added). But Mr. Wagner's claims do not concern "ownership" in the sense of the Third Circuit's rule. Here, Mr. Wagner does not allege that he was deprived of ownership of his land or of anything else.

If Mr. Wagner had plausibly alleged deprivation of a fundamental right, he has not alleged facts plausibly showing conscience-shocking behavior. Mr. Wagner argues he has alleged conscience-shocking behavior, but also that he "need only meet the 'deliberate indifference' standard." Pl.'s Mem. in Opp'n at 20. This is not persuasive legally or factually. Legally, it is true that "in some cases" deliberate indifference suffices to satisfy the substantive due process threshold. *Terrell*, 396 F.3d at 978 (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 848–49 (1998)). "When 'actual deliberation is practical,' establishing a substantive-due-process violation requires proof of deliberate indifference, rather than conscience-shocking conduct." *Scott v. Baldwin*, 720 F.3d 1034, 1036 (8th Cir. 2013) (quoting *Terrell*, 396 F.3d at 978). This statement from *Baldwin* might be understood to mean that "deliberate indifference" is a different standard from "conscience-shocking conduct." But that seems incorrect in view of *Lewis*. In *Lewis*, as the en banc

Eighth Circuit recognized in *Terrell*, the Supreme Court described the deliberate-indifference standard as a degree of culpability necessary to establish that conduct is conscience shocking, not as a degree of culpability *distinct* from conscience-shocking behavior. *Lewis*, 523 U.S. at 846–851; *Terrell*, 396 F.3d at 978. As the Eighth Circuit put it in another instance, "[i]n cases where 'defendants acted under circumstances in which actual deliberation was practical . . ., their conduct may shock the conscience of federal judges only if they acted with deliberate indifference.'" *Est. of Johnson v. Weber*, 785 F.3d 267, 272 (8th Cir. 2015) (quoting *Moore ex rel. Moore v. Briggs*, 381 F.3d 771, 773 (8th Cir. 2004)) (internal quotations omitted).

Regardless, the Amended Complaint does not allege facts plausibly showing conscience-shocking conduct even if a deliberate-indifference standard applied.[7] Mr. Wagner does not allege facts showing the inspections were deliberately indifferent in some respect. He alleges that inspections occurred, and that Defendants participated in the decision to initiate them. Am. Compl. ¶¶ 45–47. Mr. Wagner does not allege, for example, that Defendants destroyed his property during the inspections or that they were especially forceful or cruel in some aspect of their conduct. He alleges: "Defendants ignored the

---

[7]     The cases applying the deliberate-indifference standard often involve state actors causing danger, harm, death, or inadequate prison conditions. *See Lewis*, 523 U.S. at 836 (applying standard after sheriffs caused a death in a high-speed automobile chase); *Terrell*, 396 F.3d at 977 (applying standard when sheriffs caused a death while driving through a red light); *Scott*, 720 F.3d at 1035 (applying standard when Department of Corrections director detained prisoners past their release dates); *Hayes v. Faulkner Cnty.*, 388 F.3d 669, 674 (8th Cir. 2004) (finding deliberate indifference to prisoners' rights after county detained an arrestee for 38 days without a court appearance); *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976) (applying deliberate-indifference standard to cases involving "serious medical needs of prisoners"). Mr. Wagner doesn't allege anything like that here.

MPCA's normal process and procedures and a clear regulation that only allows the agency to withhold a permit based on unresolved noncompliance at the same facility." Pl.'s Mem. in Opp'n at 19–20. That Defendants may have misinterpreted their obligations under the governing regulation "does not rise to the level of arbitrary government action and egregious misconduct necessary to state a substantive due process claim." *Schmidt v. Des Moines Pub. Sch.*, 655 F.3d 811, 817 (8th Cir. 2011).

B

Mr. Wagner claims he was deprived of property in violation of his procedural due process rights. He claims a property interest in the modified NPDES permit for which he applied, as well as in "his animal feedlot, the land on which his animal feedlot is located, and the NPDES permit for his feedlot." Am. Compl. ¶ 86; Pl.'s Mem. in Opp'n at 23. Defendants argue there is no property interest in the permit, and that Mr. Wagner has not alleged that he has been deprived of his land, feedlot, or permit. Defs.' Mem. in Supp. at 22.

"As for the Due Process Clause, standard analysis under that provision proceeds in two steps: We first ask whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011). If the plaintiff cannot identify any protected liberty or property interest of which he was deprived, "any procedural due process claim necessarily fails." *Beulieu v. Ludeman*, 690 F.3d 1017, 1047 (8th Cir. 2012); *see Senty-Haugen v. Goodno*, 462 F.3d 876, 886 (8th Cir. 2006) (explaining that courts do not consider what process is due unless a plaintiff has a protected

16

liberty or property interest).  To have a property interest under the Fourteenth Amendment, a person must have a "legitimate claim of entitlement" to the property.  *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972).  "Property interests are not created by the Constitution but rather stem from an independent source such as state law." *Stauch v. City of Columbia Heights*, 212 F.3d 425, 429 (8th Cir. 2000).

The first question is whether Mr. Wagner has a property interest in the modified NPDES permit.  A review of case law in this area reveals a general rule: when a state law leaves the issuing department no discretion to approve or deny a permit, it creates a property interest, while a law that gives the issuer discretion does not.  In *Austell v. Sprenger*, 690 F.3d 929 (8th Cir. 2012), for example, the Eighth Circuit found Missouri law created no clearly established property right in the renewal of a childcare facility license when the issuing department was permitted to "deny, suspend, place on probation or revoke the license of such persons as fail to obey the provisions of [the laws] or the rules and regulations made by [the department]."  *Austell*, 690 F.3d at 936.  The department could only deny a license renewal for cause but had "substantial discretion to determine violations."  *Id.*  Accordingly, the court found the statutes governing licensing determinations were "broad, subjective, and [gave] the department substantial discretion." *Id.*  Similarly, in *Patton v. Blum*, 105 F. Supp. 3d 934 (E.D. Mo. 2015), a district court found that because a state licensing agency had "the authority to determine whether adult day care programs and applicants are in compliance with licensure laws and regulations before issuing a license," the statutes conferred "no constitutionally protected property interest."  *Patton*, 105 F. Supp. at 943–44.  By contrast, in *Stauch v. City of Columbia*

*Heights*, the court found a protected property interest in rental-license renewals because applicants "need only meet three objective criteria to qualify." *Stauch*, 212 F.3d at 430. Unlike in *Austell* or *Patton*, the issuing body had no discretion to deny renewal. *Id.*

Mr. Wagner argues the issuance of the modified permit is mandatory. Pl.'s Mem. in Opp'n at 23. He relies on a part of Minn. R. 7001.0140, which as relevant here provides: "Except as provided in subpart 2, the agency *shall* issue . . . or modify a permit." Minn. R. 7001.0140 subp. 1 (emphasis added). At first glance, the rule's use of "shall" might be understood to foreclose discretion, but the rest of the rule shows this is not the case. The rest of the rule makes clear that a permit's issuance or modification depends on the MPCA's exercise of substantial discretion:

> Except as provided in subpart 2, the agency shall issue, reissue, revoke and reissue, or modify a permit if the agency determines that the proposed permittee or permittees will, with respect to the facility or activity to be permitted, comply or will undertake a schedule of compliance to achieve compliance with all applicable state and federal pollution control statutes and rules administered by the agency, and conditions of the permit and that all applicable requirements of Minnesota Statutes, chapter 116D, and the rules adopted under Minnesota Statutes, chapter 116D, have been fulfilled. For solid waste facilities, the requirements of Minnesota Statutes, section 473.823, subdivisions 3 and 6, must also be fulfilled.

*Id.*

The MPCA thus has discretion to determine whether an applicant will comply with statutes, rules, and conditions before issuing or modifying a permit. As in *Patton*, the MPCA "shall" issue the permit only once it has determined the proposed permittee will comply with certain rules and conditions. Further, Minn. Stat. § 116.07 subdiv. 7c(a) states

18

that "[t]he agency must issue national pollutant discharge elimination system permits for feedlots only as required by federal law."  Federal law, in turn, provides that when the director of an agency "receives a request for modification . . . he or she *may determine* whether or not one or more of the causes listed in paragraphs (a) and (b) of this section for modification or revocation and reissuance or both exist."  40 C.F.R. § 122.62 (emphasis added).  The MPCA and its agents have the type of discretion described in *Austell*, where the Eighth Circuit determined that the plaintiffs had failed to show they had a clearly established property interest in renewal of their license.  *Austell*, 690 F.3d at 935.[8]

Mr. Wagner also has alleged a constitutionally protected property right in his feedlot, land, and application for a modified NPDES permit.  Am. Compl. ¶ 86.  Defendants correctly point out that Mr. Wagner has not pleaded that Defendants deprived him of his feedlot, land, or application.  Defs.' Mem. in Supp. at 22.  Because, with respect to these items, Mr. Wagner has not identified a protected property interest of which he was deprived, "any procedural due process claim necessarily fails."  *Beulieu*, 690 F.3d at 1047.

---

[8] Defendants argue that federal and state law foreclose the argument that an NPDES permit creates a property interest.  Chapter 7001 of Minnesota's Administrative Rules, which concerns MPCA permits, states that each draft and final permit must include language stating "[t]he permit does not convey a property right or an exclusive privilege." Minn. R. 7001.0150, subp. 3(C).  The draft permit sent to Mr. Wagner included this language.  Brown Decl. at Ex. 1-44.  Similarly, Title 40 of the Code of Federal Regulations, entitled "Protection of Environment," provides that the "issuance of a permit does not convey any property rights of any sort, or any exclusive privilege."  40 C.F.R. § 122.5(b). The regulation clarifies that it applies to state programs.  *Id.*  Whether these disclaimers are effective need not be decided here because the relevant rule does not confer a property right.

If the applicable rule conferred a property interest in the modified NPDES permit, Mr. Wagner does not plausibly allege he was deprived of due process. Mr. Wagner claims Defendants refused to issue his modified permit "without affording Mr. Wagner a hearing regarding the legality of [their] actions." Pl.'s Mem. in Opp'n at 25. But the Amended Complaint is self-defeating on this point: a suit seeking a writ of mandamus was available, and Mr. Wagner took advantage of it. Am. Compl. ¶ 64. Mr. Wagner commenced a legal proceeding against the MPCA for a writ of mandamus on October 4, 2018, nearly eighteen months after the May 3, 2017 inspection. *Id.* Shortly after commencing the suit, the MPCA issued the modified permit. *Id.* ¶ 65. The Amended Complaint does not allege facts plausibly showing either that more or different process might have been required under the Fourteenth Amendment.

## C

Mr. Wagner claims Defendants retaliated against him because he exercised his First Amendment rights. Specifically, Mr. Wagner alleges he exercised First Amendment-protected rights by "disputing the MPCA's legal authority to regulate his pastures and cow/calf operation as a feedlot[,]" contesting the MPCA's enforcement activities, and petitioning the Minnesota legislature to clarify the law governing feedlots in a way that benefitted Mr. Wagner. *Id.* ¶¶ 96, 100. And Mr. Wagner alleges Defendants retaliated by delaying issuance of the modified NPDES permit and "seeking to impose against Mr. Wagner the largest penalty the MPCA has ever imposed against an animal feedlot[.]" *Id.* ¶¶ 97, 102.

To state a First Amendment-retaliation claim, Mr. Wagner must allege: "(1) that he engaged in a constitutionally protected activity; (2) that the defendant[s] took adverse action against him that would chill a person of ordinary firmness from continuing in the activity; and (3) that the adverse action was motivated in part by [Mr. Wagner's] exercise of his constitutional rights." *Scheffler v. Molin*, 743 F.3d 619, 621 (8th Cir. 2014); Defs.' Mem. in Supp. at 23; Pl.'s Mem. in Opp'n at 29. Defendants acknowledge that Mr. Wagner engaged in protected activity. *See* Defs.' Mem. in Supp. at 23–24. The question, then, is whether Mr. Wagner has alleged facts plausibly showing the second and third elements.

It is at least plausible that the withholding of the modified NPDES permit and the penalty sought in MPCA's the 2021 lawsuit—whether considered together or separately—would chill a person of ordinary firmness from engaging in protected activity. According to the Eighth Circuit:

> The ordinary-firmness test is . . . designed to weed out trivial matters from those deserving the time of the courts as real and substantial violations of the First Amendment. . . . In applying this "test," we are mindful of the words of Judge Posner in *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982):
>
> > The effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable.
>
> The test is an objective one, not subjective. The question is not whether the plaintiff [himself] was deterred, though how plaintiff acted might be evidence of what a reasonable person would have done. . . . What would a person of "ordinary firmness" have done in reaction to the [adverse action]? Would he or she have simply ignored [it], or would he or she have been slowed down, at least to some degree?

21

*Garcia v. City of Trenton*, 348 F.3d 726, 728–29 (8th Cir. 2003).   "In some cases, embarrassment, humiliation and emotional distress may be sufficient to support a § 1983 claim."  *Naucke v. City of Park Hills*, 284 F.3d 923, 928 (8th Cir. 2002).  But an adverse action is more likely shown when an official causes the plaintiff to experience "concrete consequences."  *Scheffler*, 743 F.3d at 622.  In *Garcia*, for instance, a mayor's issuance of $35 in retaliatory parking tickets over less than two months was enough to chill a person of ordinary firmness and supported a jury verdict on the plaintiff's retaliation claim.  *Garcia*, 348 F.3d at 729.  If $35 in parking tickets is chilling, then withholding a permit for over a year and initiating a lawsuit seeking over $150,000 in penalties is enough to chill a person of ordinary firmness.

　　　To show causation, Mr. Wagner must allege facts plausibly showing "that a retaliatory motive of the government official was a 'but-for cause' of the adverse action, 'meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive.'"  *Graham v. Barnette*, 5 F.4th 872, 889 (8th Cir. 2021) (quoting *Nieves v. Bartlett*, 587 U.S. ---, 139 S. Ct. 1715, 1722 (2019)).  "In other words, the plaintiff must show he was 'singled out because of [his] exercise of constitutional rights.'"  *Peterson v. Kopp*, 754 F.3d 594, 602 (8th Cir. 2014).  Unless causation is "'so free from doubt as to justify taking it from the jury,' the issue should be tried."  *Lawrence v. City of St. Paul*, 740 F. Supp. 2d 1026, 1044 (D. Minn. 2010) (quoting *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004)); *De Rossitte v. Correct Care Sols., LLC*, 22 F.4th 796, 804 (8th Cir. 2022) (same).

Here, Mr. Wagner claims to possess direct evidence of a retaliatory motive. He alleges:

> According to the MPCA's internal documents that the agency produced in the state-court action, Ms. Scheirer, Mr. Hukriede, Ms. Studanski, Ms. Costin, and other employees of the MPCA based their decision to commence the state-court action and to seek to impose against Mr. Wagner the largest penalty the agency has ever imposed against an animal feedlot on the fact that Mr. Wagner had exercised his legal right to appeal prior administrative penalties the agency had sought to impose against him and the fact that Mr. Wagner "is the individual behind the legislation last year that added to the definition of pasture."

Am. Compl. ¶ 82.

These allegations do not plausibly show causation. The content of the referenced MPCA documents is not described. In other words, we do not know what the documents produced in the state-court case say or how the documents' contents might show that Defendants retaliated against Mr. Wagner because of his First Amendment-protected activities. Alleging that particular evidence shows a retaliatory motive without describing the evidence seems the same thing as alleging a legal conclusion. To properly assess whether the documents' contents plausibly show causation, it is necessary to know what is in the documents. *See Iqbal*, 556 U.S. at 680–81 (holding allegations that defendants "knew of, condoned, and willfully and maliciously agreed" to subject plaintiff to harsh conditions were insufficient to survive Rule 8's plausibility standards).

As a fallback, Mr. Wagner relies on the temporal relationship between his protected activity, on the one hand, and Defendants' delay in issuing the modified NPDES permit and their commencement of the Douglas County lawsuit in 2021, on the other. A temporal

relationship between protected activities and adverse action may "support [a] circumstantial claim of retaliatory action" in the First Amendment context. *L.L. Nelson Enters., Inc. v. Cnty. of St. Louis*, 673 F.3d 799, 809 (8th Cir. 2012).

Mr. Wagner's temporal-relationship allegations are not sufficient. The "withholding" of the permit began in May 2017, after the public comment period ended without comments in which case, according to Mr. Wagner, the MPCA's normal practice was to issue the permit. *Id.* ¶ 56. Mr. Wagner's alleged protected speech was *in response to* the withholding of the modified permit. He appears to have petitioned the legislature about changing the definition of "pastures" beginning in 2019. *Id.* ¶ 77. He sued the MPCA for a writ of mandamus in October 2018. *Id.* ¶ 64. Defendants could not have retaliated by withholding Mr. Wagner's permit in May 2017 *before* he engaged in protected speech in 2018 and 2019. The MPCA's Douglas County suit against Mr. Wagner comes closer to providing chronological support for the retaliation claim—because Defendants acted *after* Mr. Wagner exercised his First Amendment rights—but nonetheless fails for being too remote. After Mr. Wagner challenged his administrative violations between 2017 and 2019, *see* Am. Compl. ¶¶ 48, 51–52, he sued the MPCA for a writ of mandamus in Ramsey County in 2018, *see id.* ¶ 64, and he petitioned the legislature to change the law in 2019, *see id.* ¶¶ 76–77. The MPCA sued him "[i]n or around March 2021," two years after the most recent alleged exercise of his First Amendment rights. *Id.* ¶ 78. In *Kilpatrick v. King*, 499 F.3d 759 (8th Cir. 2007), the Eighth Circuit found that timing "weigh[ed] against an inference of retaliatory intent" when the protected speech and adverse action were separated by nine months. *Kilpatrick*, 499 F.3d at 768. By contrast, in *Peterson v.*

25 of 27

*Kopp*, 754 F.3d 594 (8th Cir. 2014), the court found chronology relevant to the retaliation analysis when a person exercised protected speech "moments before" the defendant's adverse actions. *Peterson*, 754 F.3d at 603. Mr. Wagner does not allege retaliation within moments—or even days or weeks—of his protected speech. Mr. Wagner alleges he engaged in protected speech through 2019 and was sued many months or years later in 2021. Under Eighth Circuit precedents, this chronology is too remote to support an inference of retaliation.[9]

IV

A district court "may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Barstad v. Murray Cnty.*, 420 F.3d 880, 888 (8th Cir. 2005) (quoting *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)). And the Eighth Circuit has instructed district courts not to exercise supplemental jurisdiction over state-law claims when, as here, all federal claims

---

[9]     Mr. Wagner alleges that Defendants conspired with each other and perhaps one or more other MPCA employees to violate his federal and state constitutional rights. Among other things, a plaintiff is "required to prove a deprivation of a constitutional right or privilege in order to prevail on a § 1983 civil conspiracy claim." *White v. McKinley*, 519 F.3d 806, 814 (8th Cir. 2008) (citing *Askew v. Millerd*, 191 F.3d 953, 957 (8th Cir. 1999)). As discussed above, Mr. Wagner has failed to allege facts plausibly showing a constitutional violation. For at least this reason, then, his conspiracy claim also fails.

are dismissed well before trial.  *See Hervey v. Cnty. of Koochiching*, 527 F.3d 711, 726–27 (8th Cir. 2008).

There is no reason to deviate from this general rule here.  Mr. Wagner has had one opportunity to amend his complaint, and he did not request an opportunity to amend in compliance with D. Minn. L.R. 15.1(b) in response to Defendants' motion.  Therefore, Mr. Wagner's federal claims will be dismissed with prejudice, and Mr. Wagner's state claims will be dismissed without prejudice to be litigated in state court, should he choose to pursue them there.[10]

## ORDER

Therefore, based on the foregoing, and on the files, records, and proceedings herein,

**IT IS ORDERED THAT**:

1.  The Motion to Dismiss [ECF No. 21] of Defendants Lisa Scheirer, Randall Hukriede, Scott Schroeder, and Rachel Studanski is **GRANTED**.

---

[10]    One might reasonably question whether Mr. Wagner's claims under the Minnesota Constitution should be dismissed at this stage.  Though Mr. Wagner sued under the Minnesota Constitution alongside his claims under the United States Constitution, he did not distinguish his state constitutional claims or treat them separately in any respect from his federal constitutional claims.  In other words, as Mr. Wagner's federal constitutional claims go, so go his state constitutional claims.  If that weren't so, Mr. Wagner's state constitutional claims are not actionable under § 1983 and lack a § 1983 analog.  As the Eighth Circuit has observed, "Minnesota courts explicitly refuse to find causes of action for damages under the Minnesota Constitution on their own unless the Minnesota Supreme Court has recognized the cause of action."  *Riehm v. Engelking*, 538 F.3d 952, 969 (8th Cir. 2008) (citing *Mitchell v. Steffen*, 487 N.W.2d 896, 905 (Minn. Ct. App. 1992), *aff'd on other grounds*, 504 N.W.2d 198 (Minn. 1993)).  Mr. Wagner cites no case in which the Minnesota Supreme Court has recognized a damages cause of action for the claims he asserts.  Regardless, Mr. Wagner asked specifically that his right to pursue these claims be preserved so that he might advocate for recognition of an applicable damages claim under the Minnesota Constitution.  That request will be honored.

2.  Pursuant to Federal Rule of Civil Procedure 12(b)(6), the claims asserted in Counts I and II of the Amended Complaint under 42 U.S.C. § 1983 are **DISMISSED WITH PREJUDICE**.

3.  Pursuant to 28 U.S.C. § 1367(c), the claims asserted in the Amended Complaint under Minnesota law are **DISMISSED WITHOUT PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Date: January 24, 2024                    s/ Eric C. Tostrud
                                          Eric C. Tostrud
                                          United States District Court

27